**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

|  |  |  |
|---|---|---|
| DAVID LACKS, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) **Case No.** | 1:18-cv-3899 |
| | ) | |
| TRANS UNION, LLC, | ) | |
| and WELLS FARGO HOME MORTGAGE, | ) | |
| *Defendants.* | ) | |

## COMPLAINT WITH JURY TRIAL DEMAND

1.       The United States Congress enacted the Fair Credit Reporting Act, 15 U.S.C.A. § 1681 (West) *et seq.* ("FCRA"), to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.  The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information on consumers.   The FCRA also imposes duties on the sources (called "furnishers") that provide credit information to credit reporting agencies.

2.       This action is based on Defendants' false reporting on Plaintiff's credit reports and willful refusal to follow reasonable procedures and conduct reasonable reinvestigations with respect to such information.

3.       This action is also based on Defendant Wells Fargo Loan Servicing, Inc.'s refusal to adhere to regulations promulgated by the Consumer Finance Protection Bureau (CFPB) that became effective on January 10, 2014, specifically, 12 C.F.R § 1024.35, et seq., of Regulation X.

**Factual Allegations Regarding The CDIA, Metro 2, And Credit Risk Scoring.**

4.      The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

5.      Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

6.       In cooperation with Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist data furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year. See, *http://www.cdiaonline.org/about/index.cfm?unItemNumber=515.*

7.      The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and data furnishers ensure that they are in compliance with their duties to ensure that they maintain complete and accurate information under the FCRA.

8.      The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

9.      The major national CRAs – Trans Union LLC, Equifax Information Services, LLC, and Experian Information Solutions, Inc., – also collaborated and developed a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such

disputes following investigation. The system is commonly referred to as e-OSCAR and was designed to be Metro 2 compliant. See, *http://www.e-oscar.org/.*

10. The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

11. ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

12. TransUnion has actual knowledge that entities reviewing consumer reports prepared by them reasonably presume they have complied with CDIA guidelines and Metro 2 standards in compiling and reporting the data therein.

13. One such entity that regularly reviews consumer reports, and uses the data contained therein, is the Fair Isaac Corporation. The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit risk scoring system, and utilizes data reported by credit reporting agencies and furnishers which are, ostensibly, in compliance with Metro 2 standards.

14. The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's FICO score.

15. Inaccurate or incorrect credit reporting often results in a lower FICO score, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

**Jurisdiction and Venue**

16.     Because this case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.A.

§ 1681 *et seq.*, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C § 2601 *et seq.*

and 12 U.S.C. § 2605(f), jurisdiction of this Court arises under 28 U.S.C.A. § 1331 (West).

17.     Venue is proper in this Court because a substantial part of the claim arose in Indiana,

Lacks resides in Indiana, and all Defendants "reside" in Indiana, as that term is used in 28 U.S.C.A.

§ 1391 (West).

**Parties**

18.     Plaintiff, David Lacks (hereinafter "Lacks"), is a natural person who resides in

Indianapolis, Indiana.

19.     Lacks is an individual and is therefore a "consumer" as that term is defined by 15

U.S.C.A. § 1681a(c) (West).

20.     Defendant Trans Union, LLC. (hereinafter "TransUnion") is a credit bureau that

conducts business in Indiana.

21.     Trans Union regularly assemble and/or evaluate consumer credit information for the

purpose of furnishing consumer reports to third parties, and use interstate commerce to prepare

and/or furnish the reports, and accordingly, are each considered a "consumer reporting agency" as

that term is defined by 15 U.S.C.A. § 1681a(f).

22.     Defendant Wells Fargo Home Mortgage. (hereafter "Wells Fargo") regularly and in

the ordinary course of business furnished information to one or more consumer reporting agencies

about Lacks' transactions and is therefore a "furnisher" as that term is used in 15 U.S.C.A. § 1681s-

2 (West).

23.     Wells Fargo is (or was) the servicer of a note (the "Note") and deed of trust on the property that allegedly secures it (collectively referred to herein as the "Loan").

24.     The Loan herein is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 617.700.

25.     Wells Fargo does not qualify for the exception for 'small servicers", as such term is defined in 12 C.F.R. §1026.41(e)(4), nor does Wells Fargo qualify for the exemption for a "qualified lender", as such term is defined in 12 C.F.R. § 617.700.

26.     Lacks asserts a private right of action under RESPA pursuant to 12 U.S.C. §2605(f) and the FCRA.

### Factual Allegations Giving Rise To This Action

27.     On or about January 31, 2017, Lacks filed a Chapter 7 bankruptcy proceeding in the Southern District of Indiana, under Cause No. 17-00490-JJG-7.

28.     Wells Fargo was listed on his Schedule D, showing a claim in the amount of $211,000.00. A true and accurate copy of the relevant portion of Lack's Schedule D is attached hereto as "Exhibit A."

29.     On April 10, 2017, Lacks and Wells Fargo entered a Reaffirmation Agreement for the continuation of the obligations between them and the repayment of monies totaling $206,789.29. A true and accurate copy of the Reaffirmation Agreement between Lacks and Wells Fargo is attached hereto as "Exhibit B."

30.     Lacks met all requirements of his Chapter 7 bankruptcy and as a result, he received a discharge by Order dated April 25, 2017.

31.     Lacks' mortgage obligation to Wells Fargo was not discharged.

32.     Lacks's mortgage obligation to Wells Fargo is not subject to discharge under 11 U.S.C. § 1328(a)(1). *See*, In re Duke, 447 B.R. 365 (Bankr. M.D. Ga. 2011).

33.     Accordingly, Lacks has continued to make, and Wells Fargo has continued to service and accept, timely and adequate payments on the mortgage obligation.

### Inaccurate and/or Materially Misleading Information Reported by Trans Union.

34.     In November of 2017, Lacks obtained a copy of his credit report as published by TransUnion.

35.     That report contained erroneous information as provided by Wells Fargo. Specifically, the TransUnion credit report failed to make any reference to the Reaffirmation Agreement attached hereto, errantly states the account was closed, did not include any information necessary to reflect the ongoing and timely payments being paid to Wells Fargo by Lacks, yet suggests the obligation was discharged via his Chapter 7 bankruptcy proceedings.

36.     TransUnion's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, which provides guidance for credit reporting and FCRA compliance.

37.     While not dispositive, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). See Gillespie v. Equifax Info. Servs., LLC., No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

38.     In response, within a letter dated November 14, 2017, Lacks disputed the inaccurate and misleading information to Trans Union and advised Trans Union of the specific facts that rendered the reporting inaccurate and misleading.  A true and accurate copy of the dispute letter is attached hereto as "Exhibit C."

39.     Pursuant to 15 U.S.C. § 1681i, Trans Union had a duty to notify Wells Fargo of Plaintiff's dispute within five business days of receiving Plaintiff's dispute, to forward all relevant information and any documents included with Plaintiff's dispute  for Wells Fargo to review, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline or delete it from Plaintiff's  consumer file.

40.     In a document dated November 20, 2017, only six days after the mailing of his dispute letter, Trans Union advised Lacks that it had researched his dispute and the current status was being reported correctly. However, Trans Union merely provided a copy of the tradeline that reproduced several of the the errors identified by Lacks in his original dispute letter.  Specifically, the Wells Fargo tradeline still failed to provide any information relative to the appropriate status of the obligation, the fact it was not discharged but reaffirmed, that Lacks continues to make timely payments as contractually obligated, and still states the account is closed. A copy of the TransUnion reinvestigation report is attached as "Exhibit D."

41.     Upon information and belief, TransUnion timely notified Wells Fargo of Lacks's dispute in accordance with 15 U.S.C.A. § 1681i.

42.     In the alternative, TransUnion failed to notify Wells Fargo of Lack's dispute at all.

43.     Upon information and belief, TransUnion did not perform any reinvestigation of Plaintiff's dispute, under either "standard" or "expedited" procedures, as described by § 1681i(a)(8), but instead simply left the Wells Fargo tradeline as previously reporting.

44.     Plaintiff's dispute was neither frivolous nor irrelevant.

45.     TransUnion did not inform Plaintiff that it had determined the dispute  was frivolous or irrelevant.

46.     TransUnion did not identify any additional information required to

investigate Plaintiff's dispute.

47.     However, Trans Union *did* inform Plaintiff of h i s  right to request a description of the procedure used to determine the accuracy and completeness of the  disputed information, including the business name and address of any furnisher of  information contacted in connection with such information and the telephone number of  such furnisher, if reasonably available, in accordance with §1681i(a)(6)(B)(iii).

48.     Accordingly, on or about May 24, 2018, Plaintiff caused a letter to be sent to TransUnion, requesting a description of the procedures Trans Union used to  determine the accuracy and completeness of the disputed Wells Fargo Mortgage information in Plaintiff's credit file and on his consumer report.

49.     Pursuant to § 1681i(a)(7), Trans Union was required to provide Plaintiff  with "a description of the procedure used to determine the accuracy and completeness of  the information," not a general description of how Trans Union responds to consumers' disputes. (Emphasis added.)  The statute requires that a CRA inform the consumer of what the CRA *actually did*, not what the CRA *might do* based on the information provided.

50.     Plaintiff's May 24, 2018, letter also specifically requested that TransUnion provide the business name, address, and telephone number of any furnisher of information that TransUnion contacted in connection with the information in Plaintiff's credit file and on his consumer report.

51.     Pursuant to § 1681i(a)(7), Trans Union was required to provide Plaintiff  with the business name and contact information of any furnisher of information contacted in connection with Plaintiff's dispute not later than 15 days after receiving Plaintiff's request.

52.     TransUnion replied to Plaintiff's request for a description of the procedures

TransUnion used to determine the accuracy and completeness of the disputed Wells Fargo Mortgage information concerning Plaintiff in his file. TransUnion replied with a nonresponsive form letter.

53.    TransUnion's form letter failed to provide the actual procedure "used" to determine the accuracy and completeness of the disputed Wells Fargo information. Instead, the form letter was a general description of how TransUnion handles consumer disputes, and different courses of action TransUnion might take based on the information a consumer provides.

54.    TransUnion did not provide a description of the procedures Trans Union actually used to determine the accuracy and completeness of the disputed Wells Fargo Mortgage information, because Trans Union never attempted to determine the accuracy and completeness of the disputed Wells Fargo Mortgage information.

55.    Instead of fulfilling its legal duty to reinvestigate Plaintiff's dispute, TransUnion willfully republished the the Wells Fargo tradeline, in reckless disregard of its duties under the FCRA.

56.    TransUnion was required to communicate the specifics of Lacks's dispute to Wells Fargo.  Likewise, Wells Fargo had a duty to investigate the dispute and accurately report their findings to Trans Union.

57.    TransUnion had an affirmative duty to reasonably reinvestigate the dispute submitted by Lacks and to accurately report the tradeline information notwithstanding the information it received from Wells Fargo.

**Trans Union's Willful Conduct in Detail.**

58.     Under § 1681i, which mandates the procedures a CRA must follow in cases of disputed accuracy, there are (only) two scenarios under which a CRA *may* legally be allowed to refrain from notifying the furnisher of disputed information of a consumer's dispute: 1.) if a CRA determines that a consumer's dispute is frivolous or irrelevant; and/or, 2.) if the CRA resolves the dispute under an expedited dispute resolution process.

59.     Neither scenario applies to TransUnion's conduct complained of herein.

60.     Under § 1681i(a)(3), a CRA *may* be relieved of its duty to notify the furnisher of the disputed information of the consumer's dispute if the CRA determines that a consumer's dispute is frivolous or irrelevant.

61.     However, because § 1681i(a)(2) requires that a CRA notify a furnisher of disputed information within five days of receiving a consumer's dispute, the CRA must make the determination that the dispute is frivolous or irrelevant before the five ( 5 ) days is up.

62.     In the event, a CRA determines that a consumer's dispute is frivolous or irrelevant, § 1681i(a)(3) requires the CRA to notify the consumer notice of the CRA's determination. That notice must: be given within five days of the CRA's determination; be in writing, or by other means authorized by consumer; state the reason(s) the CRA determined the dispute was frivolous or irrelevant; and, identify any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

63.     TransUnion did not inform Plaintiff that it had determined his dispute was frivolous or irrelevant, as required by § 1681i(a)(3)(B) if a dispute is determined to be frivolous or irrelevant.

64.    TransUnion did not identify any information required to investigate Plaintiff's dispute, as required by § 1681i(a)(3)(C) if a dispute is determined to be frivolous or irrelevant.

65.    Rather, in the reinvestigation report dated November 20, 2017, Trans Union stated, "Our investigation of the dispute you recently submitted is now complete."

66.    The statement "Our investigation of the dispute you recently submitted is now complete" is patently false – TransUnion did not perform any investigation/reinvestigation.

67.    However, the statement does make it clear that Trans Union did not determine Plaintiff's dispute to be frivolous or irrelevant.

68.    As TransUnion did not determine Plaintiff's dispute to be frivolous or irrelevant under § 1681i(a)(3), and TransUnion did not comply with the Expedited Dispute Resolution requirements of § 1681i(a)(8), then pursuant to § 1681i(a)(2) Trans Union was required to notify Wells Fargo of Plaintiff's dispute.

69.    Plaintiff's dispute was clear and unambiguous as to the inaccurate information that TransUnion was reporting.

70.    TransUnion had clear notice that the information it was reporting was false and misleading.

71.    Plaintiff provided Trans Union with all of the necessary information for TransUnion and Wells Fargo to investigate Plaintiff's dispute, and to correct the false and misleading information.

72.    If TransUnion had conducted a reasonable reinvestigation and notified Wells Fargo of Plaintiff's dispute, the Wells Fargo Mortgage information would be reported accurately.

73.    In the alternative, if TransUnion did in fact notify Wells Fargo of Lacks' dispute,

TransUnion knew that it had a duty to conduct a reasonable reinvestigation of Plaintiff's dispute regardless of Wells Fargo's findings..

74.    TransUnion had the ability to easily conduct a reasonable reinvestigation of Plaintiff's dispute.

75.    Despite the foregoing, TransUnion made the intentional choice to not conduct a reasonable reinvestigation of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

76.    Accordingly, TransUnion's conduct was willful.

77.    TransUnion had the ability to easily notify Wells Fargo of Plaintiff's dispute, via e-Oscar or otherwise.

78.    TransUnion knew that it had a duty to provide Plaintiff with the procedures TransUnion *actually used* to determine the accuracy and completeness of the disputed Wells Fargo Mortgage information.

79.    TransUnion had the ability to easily provide Plaintiff with the procedures TransUnion *actually used* to determine the accuracy and completeness of the disputed Wells Fargo Mortgage information.

80.    Despite the foregoing, TransUnion made the intentional choice to not provide the procedures it *actually used*, and instead sent a nonresponsive form letter and another reinvestigation report, in reckless disregard of its duties under the FCRA.

81.    Accordingly, TransUnion's conduct was willful.

**Wells Fargo's Post Dispute Conduct**

82.    The Defendants are each responsible for following reasonable procedures to assure

maximum possible accuracy whenever they prepare consumer reports from information in their

shared databases.

83.     The Defendants independently and jointly, breached their duties as described above

and below.

84.     By inaccurately reporting debt information after receiving notice of its errors,

the Defendants failed to take appropriate measures as set forth in 15 U.S.C.A. § 1681s-(2)(b)(1)(D)

and 1681s-(2)(b)(1)(E).

85.     As a result of Defendants' willful actions and omissions, Lacks is eligible for

actual damages, statutory damages, punitive damages and reasonable attorney's fees.

## **TRIAL BY JURY**

86.     Lacks is entitled to and hereby requests a trial by jury.

## **CAUSES OF ACTION**

### **COUNTS I & II: VIOLATIONS OF THE FCRA (TRANSUNION)**
15 U.S.C.A. § 1681e(b) and 1681i (West)

87.     Lacks incorporates by reference all preceding paragraphs as though fully stated

herein.

88.     TransUnion willfully, or in the alternative, negligently violated 15 U.S.C.A.

§1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of

Lacks's consumer reports.

89.     TransUnion also willfully, and/or with malice, or in the alternative, negligently

violated 15 U.S.C.A. § 1681i in multiple ways including without limitation by failing to conduct a

reasonable reinvestigation of Lacks's dispute and by failing to appropriately delete or modify

inaccurate information in Lacks's file. *See* Zahran v. Bank of Am., 2015 WL 4397779 (N.D. Ill.

July 17, 2015)

90.     As a result of TransUnion's violation of 15 U.S.C.A. § 1681e(b) and 15 U.S.C.A.

§1681i, the continued presence of the inaccurate and/or materially misleading information on

Lacks's credit report has caused him actual damage including but not limited to emotional distress,

the unjust suppression of his FICO credit score, the payment of increased costs of credit and

insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future

financial harm if the information is not corrected. Those actual damages include the loss of time,

payment of increases costs of credit and insurance, and certain out-of-pocket expenses.  Therefore,

Lacks is entitled to recover actual damages pursuant to 15 U.S.C.A. § 1681n and 1681o (West) and

statutory damages pursuant to 15 U.S.C.A. § 1681n.

91.     Lacks is entitled to recover costs and attorney's fees from TransUnion pursuant to

15 U.S.C.A. § 1681n and 1681o.

## COUNT III: VIOLATIONS OF THE FCRA (TRANSUNION)
### 15 U.S.C. § 1681i(a)(7)

92.     Plaintiff incorporates by reference all preceding paragraphs as though fully

stated herein.

93.     Pursuant to § 1681i(a)(7), Trans Union had a duty to provide Plaintiff a

description of the procedures Trans Union actually used to determine the accuracy and

completeness of the disputed Wells Fargo Mortgage information concerning Plaintiff  in his file

and consumer report.

94.     As described herein, TransUnion willfully, or in the alternative negligently,

violated 15 U.S.C. § 1681i(a)(7) by failing to provide Plaintiff a  description of the procedures

TransUnion actually used to determine the accuracy  and completeness of the disputed Wells

Fargo Mortgage information concerning Plaintiff  in his file and consumer report, in reckless

disregard of its duties under the FCRA.

95.     TransUnion's actions as described herein were willful, and caused Lacks actual damage as set forth herein, rendering TransUnion liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

96.     TransUnion's actions also caused Lacks actual damage in the form of an informational injury, loss of time, and the payment of out-of-pocket expenses.

97.     Plaintiff is entitled to recover costs and attorney's fees from TransUnion pursuant to 15 U.S.C. §§ 1681n and 1681o.

### COUNT IV:  VIOLATIONS OF THE FCRA (Wells Fargo)
15 U.S.C.A. § 1681s-2(b)

98.     Lacks incorporates by reference all preceding paragraphs as though fully stated herein.

99.     Wells Fargo willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Lacks's dispute from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the consumer reporting agencies, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, delete, and/or block the inaccurate information.

100.    As a result of Wells Fargo's violations of 15 U.S.C.A. § 1681s-2(b), Lacks has suffered actual damages including but not limited to emotional distress (aggravation, anxiety, and loss of rest), the unjust suppression of his FICO credit score, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future financial harm. Therefore, Lacks is entitled to recover actual damages under 15 U.S.C.A. § 1681n and 1681o.

101.    Wells Fargo's actions and omissions were willful, caused Lacks concrete injury as set for above, rendering it liable for punitive damages and/or statutory damages pursuant to 15 U.S.C.A. § 1681n.

102.    Lacks is entitled to recover costs and attorney's fees from Wells Fargo pursuant to 15 U.S.C.A. § 1681n and 1681o.

## COUNT V: VIOLATIONS OF RESPA (Wells Fargo)
## 12 C.F.R. § 1024.35(e)

103.    On or about January 19, 2018, Lacks directed correspondence to Wells Fargo captioned or otherwise titled "Request for Information Pursuant to 12 C.F.R. § 1024.36" (RFI No. 1), via certified mail.

104.    Within RFI No. 1, Lacks requested a "[c]opy of current credit reporting data and/or e-Oscar AUD's provided to any credit reporting agency relative to the loan identified herein (the "Loan Reporting Credit Data Request" or "LRCDR").

105.    12 C.F.R. § 1024.36(d)(l) provides, in relevant part, that:

> [A] servicer must respond to an information request by either:
> (i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or
> (ii) Conducting a reasonable search for the requested infomlation and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance

106.    Furthermore, 12 C.F.R. § 1024.36(d)(2)(i) provides that:

> [A] servicer must comply with the requirements of paragraph (d)(1) of this section:
> (A)    Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan; and
> (B)    For all other requests for information, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays)

after the servicer receives the information request.

107.    Lacks sent RFI No. 1 to Wells Fargo at its self-designated address for the receipt of such correspondence as described in 12 C.F.R. § 1024.36(b).

108.    Wells Fargo received RFI No. 1 on or about January 25, 2018.

109.    In response to RFI No.1, on February 21, 2018, Wells Fargo refused to provide the information requested by and through the LRCDR stating: "We've completed our review of your request for credit reporting data and audits. We've determined the items you requested are considered to be confidential, privileged and/or proprietary information of Wells Fargo. For this reason, we're unable to provide the documents requested. A true and accurate copy of Wells Fargo's response to RFI No. 1 and the LRCDR is attached hereto as "Exhibit E."

110.    Wells Fargo reported credit data via 'e-Oscar" or another 3rd party data portal (i.e. Black Knight) to the CRAs in the ordinary course of its business of servicing the Loan for the time periods responsive to the LRCDR.

111.    For a consumer such as Lacks, Wells Fargo is the most reliable and direct source of this information due to the direct nature of their relationship.

112.    RFI No. 1 constituted a request for information pursuant to 12 C.F.R. §1024.36(a) as each RFI requested information "with respect to the borrower's mortgage loan."

113.    In reply to Wells Fargo's objection and refusal to provide the requested LRCDR, Lacks directed correspondence titled "Notice of Error Pursuant to Section 1024.35 of Regulation X" (NOE No. 1), via certified mail.

114.    Within NOE No. 1, Lacks notified Wells Fargo of two (2) specific errors: a. "Wells Fargo has failed to adequately respond to an RFI within thirty business days, or forty-five if an extension was sought, when it refused to provide all information pertaining to

reporting of the Borrower's payment information to any Credit Reporting Agency. This is a defined error as set forth in 12 C.F.R. 1024.35(b)(11).''; and b. "Wells Fargo has made an unreasonable determination that information sought by the Borrower is unduly burdensome, irrelevant, confidential, proprietary or privileged in violation of Reg. X. 12. C.F.R. 1024.36(f)(1)(ii) and/or has waived the exclusion for failure to notify the Borrower in writing of this determination within five (5) business days as mandated by 12 C.F.R. 1024.36(f)(2). A true and accurate copy of NOE. No. 1 is attached hereto as "Exhibit F."

115.    In response to NOE No. 1, Wells Fargo directed correspondence dated August 8, 2018 stating: "We also understand you disagree with our findings that the credit reporting information being requested is propriety. Your request for credit reporting data and audits is not something we are able to provide due to the sensitive nature of this information. We regret this is not the outcome you were hoping for." A true and accurate copy of Wells Fargo's response to NOE. No. 1 is attached hereto as "Exhibit G."

116.    12 C.F.R. 1024.35(e)(l )(i) provides that a servicer must respond to a notice of error by either:

> (A)    Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or
> (B)    Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

117.    NOE No. 1 sets out multiple errors in servicing by Wells Fargo in refusing to provide Lacks with information responsive to the LRCDR.

118.     Wells Fargo failed to reasonably investigate and respond to these errors, instead referring back to its unreasonable objection and contention the requested information was somehow confidential or proprietary.

119.     In response, hoping Wells Fargo would reconsider it unreasonable position, Lacks directed correspondence captioned "Second Notice of Error Pursuant to Section 1024.35 of Regulation X" ("NOE No. 2"). A true and accurate copy of NOE No. 2 is attached hereto as "Exhibit H."

120.     Within NOE No. 2, Lacks again notified Wells Fargo of its continued failure to adequately respond to RFI No. 1 and that its basis for refusing to provide the information requested was without legal basis.

121.     Specifically, NOE No. 2 states:

"The Official Bureau Interpretations to Regulation X provide the following examples of confidential, propriety, or privileged information: (1) information regarding management or profitability of a services; (2) compensation or personnel actions relating to servicer personnel, including the personnel responsible for serving a borrower's mortgage loan; (3) records of examination reports, compliance audits, borrower complaints, and internal investigations or external investigations; or (4) information protected by the attorney client privilege.  *Clearly the Borrowers request has no basis or relationship with or to any of the examples set forth above.*

The Official Bureau Interpretations to Regulation X provide the following examples of an overbroad or unduly burdensome request for information: (1) requests that seek documents regarding "substantially all aspects of mortgage services, ie. a request for all mortgage loan filed documents; (2) requests that purport to require servicers to providing information in specific formats such as a spreadsheet when such information is not ordinarily stored in such format; (3) requests that are not reasonably understandable; and (4) requests that are not likely to assist a borrower with the account, including, for example, copies of the front and back of all physical payment instruments. *Again, the Borrower's request clearly does not fit within any of the above described examples or the intend of the exclusions.*

Wells Fargo's continued refusal to comply with its statutory requirements has caused an informational injury upon Mr. Lacks that must be corrected."

122.    NOE No. 2 was sent to Wells Fargo at its self-designated address for the receipt

of such correspondence as described in 12 C.F.R. § 1024.36(b).

123.    Wells Fargo received NOE No. 2 on or about August 20, 2018.

124.    In response to NOE No. 2, Wells Fargo directed correspondence dated August

30, 2018 stating: "We've determined your concerns were previously addressed by us, and we

didn't find you had enclosed any new information or significantly different details which

would change our response. We're enclosing our previous response to you, originally sent on

August 8, 2018." A true and accurate copy of Wells Fargo's response to NOE No. 2 is

attached hereto as "Exhibit I."

125.    NOE No. 2 sets out multiple errors in servicing by Wells Fargo in continuing to

refuse to provide Lacks with information responsive to the LRCDR.

126.    NOE No. 2 included new information and further support for why Wells Fargo's

position and rationale for refusing to provide the requested information was unreasonable and

without legal basis.

127.    Wells Fargo failed to reasonably investigate and respond to NOE. 2, instead

referring back to its unreasonable contention the requested information was confidential or

proprietary.

128.    In response, desperately hoping Wells Fargo would reconsider it unreasonable

refusal to provide the requested information, Lacks directed correspondence captioned "Third

Notice of Error Pursuant to Section 1024.35 of Regulation X" ("NOE No. 2"). A true and

accurate copy of NOE No. 3 is attached hereto as "Exhibit J."

129.    Within NOE No. 3, Lacks (again) notified Wells Fargo that its continued

refusal to provide the information contained within RFI No. 1 was unjustified and that its failure to reasonably respond to NOE No. 1 was in violation of 12 C.F.R. § 1024.S(e).

130.    NOE No. 3 was sent to Wells Fargo at its self-designated address for the receipt of such correspondence as described in 12 C.F.R. § 1024.36(b) via certified mail.

131.    As of the date of this Complaint, Wells Fargo has failed to provide Lacks with information responsive to the LRCDR, as requested within RFI No. 1, or provide an adequate response to the errors identified in NOE No. 1, NOE No. 2, or NOE No. 3.

132.    L has alleged by and through NOE No. 1, NOE No. 2 and NOE No. 3 that Wells Fargo has committed six (6) distinct errors pursuant to 12 C.F.R. §1024.35(b)(2) by failing to provide all of the information and/or documentation requested by and through RFI No. 1 and within NOE No. 1, and its failure to correct the multiple servicing errors raised therein.

133.    Wells Fargo's  actions, here and in its general refusal to provide other borrower's with information pertaining to how their loans are being reported to the credit reporting agencies, are a pattern and practice of behavior in conscious disregard of RESPA and Lack's substantive rights.

134.    Furthermore, Wells Fargo's actions have caused Lacks to incur actual damage in the form of travel expenses, an informational injury, expenses for the investigation and assistance in preparing Notices of Error, and the preparation and prosecution of this action.

135.    As a result of Wells Fargo's actions, Wells Fargo is liable to Plaintiff for actual damages, statutory damages, costs, and attorneys' fees.

**WHEREFORE**, Lacks respectfully requests the following relief:

a.  For actual damages against Defendants jointly and severally, as applicable, as to all the allegations contained herein;

b.  For statutory damages of Two Thousand Dollars ($2,000.00) against Defendant Wells Fargo for each and every violation contained in Count V;

c.  For statutory damages of One Thousand Dollars ($1,000.00) against Defendant Wells Fargo for each and every violation contained in Count IV;

d.  For statutory damages of One Thousand Dollars ($1,000.00) against Defendant TransUnion for each and every violation contained in Counts I-III;

e.  For reasonable attorney's fees and costs against Defendants jointly and severally, as applicable,  pursuant to 15 U.S.C.A. § 1681n and/or 1681o;

f.  That an Order be issued for the Defendants to modify, delete or block the inaccurate information being reported; and

g.  Such other and further relief as may be just and proper.

Respectfully submitted,

*/s/ Travis W. Cohron*
Travis W. Cohron, No. 29562-30
**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
tcohron@clarkquinnlaw.com
***Counsel for the Plaintiff***